UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------------

MOUNT SINAI GENOMICS, INC. d/b/a
SEMA4,

          Plaintiff,

vs.

STEVEN FLETCHER,

          Defendant.

CASE NO. _____

APRIL 3, 2020

------------------------------------------------------------

## VERIFIED COMPLAINT

As and for its Verified Complaint against Steven Fletcher ("defendant" or "Fletcher") in the above-captioned case, plaintiff Mount Sinai Genomics, Inc. d/b/a Sema4 ("plaintiff" or "Sema4") alleges as follows:

### NATURE OF THE ACTION

1. This action arises out of Fletcher's (a) intentional breach of certain restrictive covenants contained in (i) the Sema4 Proprietary Information and Invention Assignments Agreement (the "PIIA") executed by Fletcher on or about June 17, 2019 as a condition of his employment by Sema4; and (ii) a Non-Competition and Non-Solicitation Agreement (the "Non-Competition Agreement") executed by Fletcher on July 26, 2019 as a condition of his participation in a variable compensation plan (copies of the PIIA and Non-Competition Agreement are attached hereto as **Exhibits A** and **B**, respectively) (b) misappropriation of plaintiff's confidential information and trade secrets, and (c) breach of the duty of loyalty Fletcher owed to Sema4 as his employer.

## PARTIES

2.  Sema4 is a corporation organized under and existing pursuant to the laws of the State of Delaware, with a principal place of business located at 333 Ludlow Street, North Tower, 8th Floor, Stamford, Connecticut. Sema4 is a patient-centered health intelligence company offering a variety of genetic testing products and services. Sema4 is dedicated to transforming healthcare by building dynamic models of human health and defining optimal, individualized health trajectories, including in the areas of reproductive health and oncology.

3.  Upon information and belief, Fletcher resides at 64 Jenkins Road, Andover, Massachusetts. Sema4 employed Fletcher from on or about July 8, 2019 to on or about January 17, 2020 in the capacity of Director, Hereditary Cancer Solutions.

4.  Upon information and belief, Fletcher is now currently employed by Natera, Inc. ("Natera"), a corporation organized under and existing pursuant to the laws of the State of Delaware, with a principal place of business located at 201 Industrial Road, Suite 410, San Carlos, California. Natera is a direct competitor of Sema4, and like Sema4, Natera is also in the business of offering genetic testing products and services.

## JURISDICTION AND VENUE

5.  This Court has original federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that plaintiff alleges a claim under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(c), a federal statute.

6.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

7. This action is also subject to the Court's diversity jurisdiction under 28 U.S.C. § 1332, as there is complete diversity and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8. Section 9(a) of the Non-Competition Agreement provides that "the parties agree that any action or proceeding with respect to this Agreement and [Fletcher's] employment shall be brought exclusively in the Superior Court of Connecticut, Fairfield County, or in the United States District Court for the District of Connecticut, or in any other court of competent jurisdiction sitting in Fairfield County, Connecticut, and the parties agree to the personal jurisdiction thereof." Fletcher has therefore consented to personal jurisdiction in the Connecticut courts.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this district, where plaintiff is headquartered and the confidential proprietary information and trade secrets misappropriated by Fletcher are stored, and (ii) pursuant to the Non-Competition Agreement that lies at the heart of this action, Fletcher and Sema4 stipulated to venue in the Connecticut courts for any action arising under or relating to said agreement.

## FACTS

10. Sema4 produces advanced genetic tests and offers its clients screenings for inherited disorders and genetic variants, among many other clinical testing and health information products. Sema4's acclaimed testing methods and overall progress in the field of genetics have been internationally recognized, and some of the world's leaders in data science, network modeling, multiscale biotechnology, and genomics have benefitted from Sema4's research results. Sema4 employs advanced and unique analytical tools to develop its genetic tests, which tools also

3

assist with launching clinical studies, managing data for patient populations, and comparing patient outcomes.

11.     The confidential trade secrets and proprietary information associated with Sema4's genetic test development, unique analytical tools, market strategy, and client base derive economic value from not being generally known to, and not being readily accessible by, third parties, including Sema4's competitors.

12.     Sema4 has invested significant time, money, and resources to maintain the confidentiality of its trade secrets and proprietary information and thereby ensure Sema4 is solely able to use and benefit from its valuable tools.  For example, Sema4 requires that its proprietary information is stored on secure platforms controlled by Sema4's information technology and security team, which provides training and instructions on using those platforms and systems, and all Sema4 employees must request and be granted access to those platforms.  Sema4 also requires its employees, as a condition of employment, to sign the PIIA and agree to comprehensive non-disclosure and non-solicitation clauses.  The PIIA also requires that Sema4 employees take various precautions to safeguard its confidential and proprietary information, such as using secured networks and password protection and diligently reporting any actual or suspected losses of company-related information.

13.     Fletcher began working for Sema4 on or about July 8, 2019.  Throughout his employment, Fletcher served at Sema4 in the capacity of Director, Hereditary Cancer Solutions and reported directly to Michelle Zimmerman, Senior Vice President and General Manager of Oncology Solutions.  In his role with Sema4, Fletcher was responsible for, *inter alia*, launching and collaborating to strategically market Sema4's oncology products, determining the nature and scope of present and future products and assessing market competition by comparing Sema4's

4

products to competitors' products, developing and implementing market research strategies, including strategies to offer oncology tests through the same channels as Sema4 sells reproductive tests, defining product market communications objectives in partnership with marketing, assessing product market data by calling on customers along with salespeople and evaluating sales call results, preparing sales forecasts in partnership with the sales team, and analyzing proposed product requirements and product development programs.

14. Given his high-level role, in which he was accountable for both product strategy and in-market performance (*i.e.*, sales achievement), Fletcher worked closely with Sema4's senior sales team and was granted unfettered access to Sema4's confidential trade secrets and proprietary information in order to adequately understand the products he was supposed to develop, sell and market, including how those products fit within both Sema4's oncology and women's health portfolios, as well as the markets, channels and customers Sema4 planned to target. As a result, Fletcher has extensive knowledge of Sema4's women's health and oncology strategic initiatives in terms of sales, marketing, product development, operations, patient engagement, and customer satisfaction; the terms of Sema4's contracts with customers; customer preferences and requirements; pricing practices, and the like.

15. For instance, because the customer base for Sema4's hereditary cancer testing products largely overlaps with the customer base for Sema4's reproductive testing products, Fletcher was also privy to, and upon information and belief has retained, extensive confidential and proprietary information relating to the largest segment of Sema4's business, women's health. This information would be of significant value to a competitor, like Natera, seeking to develop or improve upon reproductive testing products and take away market share from Sema4. Further, because Fletcher's role was within Sema4's oncology business unit, Fletcher had knowledge of

Sema4's overarching oncology strategy, inclusive of somatic testing, information platforms and tools. This information would be especially valuable to Natera, which has recently entered the somatic testing market with its Signatera liquid biopsy solution and is in partnership with Foundation, one of Sema4's key competitors.

16. As a condition of his employment, Fletcher was required to agree to the terms of Sema4's offer letter ("Employment Letter"), in addition to executing the PIIA. Fletcher signed the Employment Letter on June 17, 2019. A true and accurate copy of the Employment Letter is attached hereto as **Exhibit C**.

17. The PIIA obligates Fletcher to, *inter alia*, "hold in strictest confidence and [] not disclose, use, lecture upon or publish any of [Sema4's] Proprietary Information …" (PIIA, Sec. 1.1). For purposes of the PIIA, "Proprietary Information" is defined to "mean any and all confidential and/or proprietary knowledge, materials, data or information of [Sema4]" and "includes: (a) trade secrets, inventions, mask works, ideas, processes, formulas, algorithms, source and object codes, data, programs, other works of authorship, brand names, logos, know-how, improvements, discoveries, developments, designs, techniques and materials …; and (b) information regarding plans for research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, process and costs, suppliers and customers; and (c) sensitive personnel information including the skills and compensation of other employees of [Sema4]." (PIIA, Sec. 1.2).

18. By way of the PIIA, Fletcher further agreed "that for the period of [his] [e]mployment by [Sema4] and for one (1) year after the date [his] [e]mployment by [Sema4] ends for any reason, including by [Fletcher] or involuntary termination by [Sema4], [he] will not, either directly or through others, (i) solicit or attempt to solicit any employee, independent contractor or

6

consultant of [Sema4] to become an employee, consultant or independent contractor to or for any other person or entity, or to otherwise diminish their relationship with [Sema4], or (ii) solicit any customers of [Sema4] with whom [he] had contact or whose identity [he] learned as a result of [his] [e]mployment with [Sema4]." (PIIA, Sec. 5).

19. By way of the Employment Letter, Fletcher agreed that his "employment with [Sema4] will be subject to … reasonable non-competition, non-solicitation, and non-disparagement obligations (in the case of non-competition and non-solicitation obligations, not to exceed one (1) year from the date of termination of [his] employment with [Sema4)]." The Employment Letter also specifies that Fletcher was eligible to receive a targeted bonus contingent on successfully achieving predetermined performance goals. In order to be eligible for Sema4's bonus opportunities, Fletcher was required to agree to the terms of the Company's Variable Compensation Plan ("the Plan"). Fletcher signed on to the Plan on July 26, 2019. A true and accurate copy of the Plan is attached hereto as **Exhibit D**.

20. As a condition of participating in the Plan, and thereby enjoying the prospect of earning significant variable compensation, Fletcher was required to sign the Non-Competition Agreement attached hereto as **Exhibit B**.

21. Pursuant to the Non-Competition Agreement, Fletcher agreed that "for a period of twelve (12) months after employment with [Sema4] ends, whether voluntarily or involuntarily, [he] will not, without the express written consent of the CEO of [Sema4], directly or indirectly, own, manage, operate or control, or be employed in a capacity similar to the position(s) [he] held…with [Sema4], by any person, company or entity engaged in such segment(s) of [Sema4's] Business for which [he] had responsibility while employed by [Sema4]." (Non-Competition Agreement, Sec. 2).

22. The Non-Competition Agreement clarifies that "'Business' means the development, manufacture, sale, and distribution of genetic and genomic testing products and services, including reproductive and prenatal testing, pharmacogenetic testing, molecular oncology and cancer testing, diagnostic sequencing, cytogenetic and cytogenomic testing, and biochemical genetic testing, health data services and health information analysis, and related products and services." (Non-Competition Agreement, Sec. 2).

23. Per the Non-Competition Agreement's non-disclosure provision, Fletcher agreed that "while associated with [Sema4] and for so long thereafter… [he would not] directly or indirectly use, disclose or disseminate to any other person, organization or entity or otherwise use any Confidential Information or Trade Secrets." (Non-Competition Agreement, Sec. 1).

24. The Non-Competition Agreement defines "Confidential Information" as "items of information relating to [Sema4], its products, services, customers, suppliers, vendors, business partners, and employees that are not generally known or available to the general public, but have been developed, compiled or acquired by [Sema4] at its great effort and expense." "Trade Secrets" are defined in the Non-Competition Agreement as "items of Confidential Information that meet the requirements of applicable trade secret law." The Non-Competition Agreement additionally notes that "Confidential Information and Trade Secrets can be in any form: oral, written or machine readable, including electronic files." (Non-Competition Agreement, Sec. 1).

25. Under the Non-Competition Agreement's non-solicitation covenant, Fletcher agreed that "so long as [he] is employed by [Sema4] (except on behalf of [Sema4]) and for a period of twelve (12) months after employment with [Sema4] ends, whether voluntarily or involuntarily, [he] will not directly or indirectly solicit or service customers or prospective customers of [Sema4]

or its predecessors for the purpose of selling products and services of the type developed, sold and provided by [Sema4]." (Non-Competition Agreement, Sec. 3).

26. The Non-Competition Agreement's non-solicitation covenant also bars solicitation of "any employee, contractor or consultant of [Sema4] to leave employment with or service to [Sema4], or diminish their services to [Sema4]." (Non-Competition Agreement, Sec. 4).

27. On January 6, 2020, Fletcher verbally resigned from Sema4 with two weeks' notice. Fletcher thereafter formally notified Sema4 in writing that he was resigning effective January 13, 2020. As it turned out, Fletcher's last day at Sema4 was January 17, 2020.

28. Upon information and belief, immediately following his resignation from Sema4, or even earlier, Fletcher began working at one of Sema4's direct competitors, Natera. Fletcher never disclosed to Sema4 that he intended to work at one of Sema4's competitors following his departure, and indeed refused to disclose the identity of his new employer. This despite the fact that by executing the Non-Competition Agreement, Fletcher "covenant[ed] and agree[d] to promptly inform [Sema4] in writing of all employment or business ventures in which [he] becomes engaged (other than employment by [Sema4]) unless all post-employment restrictions contained [in the Non-Competition Agreement] expire." (Non-Competition Agreement, Sec. 7). Fletcher never responded to a pair of letters from Sema4's outside counsel demanding compliance with his obligations under the Non-Competition Agreement. (A copy of counsel's letters is attached hereto as **Exhibit E**).

29. Upon information and belief, Natera hired Fletcher to fill a high-level position as regional director of sales or a similar role. Sema4 is informed and believes that in this capacity Fletcher is responsible for leading a sales team to sell Natera's testing products, overseeing sales activities, and directly interacting with Natera's customers and prospective customers. In fulfilling

his responsibilities for Natera, Fletcher has, or inevitably will, be informed by the extensive confidential and proprietary information he possesses regarding Sema4's strategic initiatives, customer relations, and contract terms.

30. Following Fletcher's resignation, Sema4 searched Fletcher's emails on Sema4's systems and hardware to determine if Fletcher downloaded, forwarded, or otherwise possessed any Sema4-related information. Sema4 ultimately discovered that, on December 16, 2019, prior to resigning, Fletcher sent a highly confidential proprietary list of genes Sema4 has identified for use in developing future hereditary cancer testing products to his personal email account. The gene list falls squarely within the PIIA's definition of "Proprietary Information" as well as the Non-Competition Agreement's definition of "Confidential Information" and "Trade Secrets," and also meets the DTSA's definition of a "Trade Secret" in that the information contained on the gene list derives independent economic value from not being generally known or reasonably ascertainable to another person who can obtain economic value from the disclosure or use of the information and Sema4 has taken reasonable measures to keep such information secret.

31. Upon information and belief, Fletcher is still in possession of Sema4's proprietary gene list. In addition, Fletcher still possesses knowledge of extensive confidential and proprietary information regarding Sema4's strategic initiatives, customer relations, and contract terms for both its oncology and women's health businesses. In particular, in his role at Sema4, Fletcher worked with materials that outline all of Sema4's customers, their geography, and testing volume over time across all oncology and reproductive health products. If Fletcher disseminates the gene list to his current employer, Natera, or otherwise exploits either the misappropriated list or other forms of confidential and proprietary information he possesses by virtue of his association with Sema4,

for the benefit of Natera or any other Sema4 competitor, Sema4's business would be irreparably damaged.

32. If the gene list fell into the hands of a competitor, like Natera, the information could be used to develop, launch, and market a competing hereditary cancer testing product using the genes on the list, among others. Indeed, upon information and belief, Natera is in the process of developing its own hereditary cancer testing product. Given access to Sema4's gene list, Natera could use this information to expedite the gene selection and developmental process and launch a more expansive, and therefore more competitive, hereditary cancer testing product before Sema4 is ready to launch its own hereditary cancer testing product. In this way, Natera would be able to use this information to generate significant market power, thereby causing Sema4 to lose a competitive advantage and revenue opportunities.

33. Fletcher is uniquely well-positioned to use his knowledge of Sema4's hereditary cancer customer base as well as Sema4's business strategies to facilitate the solicitation of Sema4's customers.

34. Through Sema4's review of Fletcher's emails on his Sema4 laptop, Sema4 also discovered that prior to Fletcher's departure from Sema4, Fletcher willingly and actively recruited a Sema4 employee to leave Sema4 in violation of the non-solicitation provisions of both the PIIA and the Non-Competition Agreement.

## COUNT I:
## TRADE SECRET MISAPPROPRIATION UNDER THE DEFEND TRADE SECRETS ACT
## (18 U.S.C. § 1836)

35. Sema4 incorporates and realleges paragraphs 1 through 34 above as if fully set forth herein.

36. Sema4 owns and possesses highly confidential, economically valuable trade secrets and proprietary information that its crucial to its overall success now and in the future, including the gene list misappropriated by Fletcher, as well as the extensive confidential and proprietary information Fletcher possesses, as to both the oncology and women's health lines of business, relating to Sema4's strategic initiatives, customer relations, and contract terms.

37. Sema4 has taken substantial measures to prevent competitors and other third parties from obtaining its confidential trade secrets and proprietary information. For example, Sema4 requires its employees, as a condition of employment, to sign comprehensive agreements containing non-disclosure and other restrictive covenants, employs password protections and other cybersecurity measures, and demands that its employees be vigilant in protecting against the dissemination of Sema4's private information, including through the PIIA.

38. Upon information and belief, Fletcher has misappropriated a proprietary list of genes Sema4 identified for use in developing future products, with the intent to use such information to benefit his new employer, Natera. In addition, Fletcher possesses highly confidential and proprietary information of a strategic and evaluative nature relating to both the oncology and women's health lines of business that would be of great value to a Sema4 competitor such as Natera. In the sales-related role Fletcher is believed to have assumed at Natera he is poised to exploit Sema4's confidential and proprietary information for the benefit of Natera.

39. To date, Fletcher has not returned Sema4's confidential trade secrets and proprietary information and, upon information and belief, still possesses such material.

40. Sema4 has already been significantly injured by Fletcher's misappropriation of its trade secrets and proprietary information and will be further damaged if this information is exploited for the benefit of Natera.

## COUNT II:
## BREACH OF CONTRACT

41. Sema4 incorporates and realleges paragraphs 1 through 40 above as if fully set forth herein.

42. The PIIA and the Non-Competition Agreement executed by Fletcher are valid, legally binding, and enforceable contracts supported by adequate consideration, namely Fletcher's access to Sema4's confidential trade secrets and proprietary information as well as, in the case of the PIIA, Fletcher's employment by Sema4, and in the case of the Non-Competition Agreement, Fletcher's participation in Sema4's Variable Compensation Plan.

43. Sema4 has fully complied with its obligations under the PIIA and the Non-Competition Agreement and all other agreements with Fletcher.

44. The Non-Competition Agreement contains a covenant not to compete prohibiting Fletcher from accepting employment with any entity that engages in the same line of business as Sema4 for a period of twelve months after his employment with Sema4 ends. (Non-Competition Agreement, Sec. 2).

45. This non-competition covenant is reasonable in duration and scope and is narrowly tailored to protect Sema4's legitimate interest in preserving its confidential trade secrets and proprietary information, as well as client relationships and goodwill. By signing the Non-Competition Agreement as an act of his own free will on July 26, 2019, Fletcher acknowledged and agreed that the non-competition covenant was reasonable as to scope and duration and reasonably necessary to safeguard Sema4's legitimate and protectable business interests.

46. By accepting a high-level sales position with Natera, a direct competitor of Sema4, Fletcher violated the Non-Competition Agreement's non-competition covenant.

47. Additionally, Fletcher violated the non-disclosure covenants contained in the PIIA and the Non-Competition Agreement. These covenants provide that Fletcher shall not directly or indirectly use, disclose or disseminate to any other person, organization or entity or otherwise use any of Sema4's proprietary or confidential information or trade secrets. Fletcher breached these covenants when he downloaded and forwarded to a personal email account Sema4's proprietary gene list. Upon information and belief, Fletcher has used, or intends to use, this gene list, as well as the extensive confidential and proprietary information he was privy to as a high-level Sema4 executive, for the benefit of Natera and/or other Sema4 competitors.

48. Moreover, upon information and belief, Fletcher violated the non-solicitation covenants contained in the PIIA and the Non-Competition Agreement, barring Fletcher, for a period of one year after his employment with Sema4 ends, from directly or indirectly soliciting Sema4's employees and current or prospective customers. For example, emails confirm that while still employed by Sema4, Fletcher encouraged at least one other Sema4 employee to pursue an opportunity to work with Natera. Additionally, Fletcher is aware of the list of doctors, practices, and other healthcare providers that order Sema4's hereditary cancer and reproductive tests, which, upon information and belief, Fletcher has or intends to use to solicit Sema4's current and prospective customers for the benefit of Natera.

49. Fletcher's breaches of the PIIA and the Non-Competition Agreement has caused Sema4 to suffer irreparable harm for which there is no adequate remedy at law and to sustain damages. These breaches are especially severe considering the difficulty of calculating how much business Sema4 will continue to lose going forward as a consequence of Fletcher's actions.

## COUNT III:
## VIOLATION OF THE CONNECTICUT
## UNIFORM TRADE SECRETS ACT ("CUTSA")

50. Sema4 incorporates and realleges paragraphs 1 through 49 above as if fully set forth herein.

51. Sema4 designs its own tools and tests in furtherance of Sema4's business objectives. In addition, Sema4 has developed a wide range of strategic initiatives and maintains extensive information about customers, prospective customers, market trends, and the like, to which Fletcher had ready access and utilized in the performance of his high-level position at Sema4. As this information constitutes trade secrets within the meaning of Connecticut's Unfair Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. §§ 35-50, *et seq.*, the dissemination of such information to Sema4's competitors or other individuals would be disastrous for Sema4's business.

52. Sema4 has put in place many procedures to guard against the dissemination of its valuable information to competitors and other third parties.

53. By clandestinely downloading Sema4's confidential gene list and forwarding it to his personal email account, Fletcher misappropriated Sema4's proprietary information— information that would be of significant value to a competitor, like Natera. Upon information and belief, Fletcher also continues to possess the highly confidential and proprietary information regarding matters of strategy, customer relations, and market insights that were essential to his successful performance of his role at Sema4. Having assumed a high-level position with Natera, a direct competitor of Sema4, it stands to reason that, unless he is prevented from doing so, Fletcher inevitably will utilize the confidential and proprietary information he learned through his association with Sema4, as well as the gene list and other information he misappropriated from

Sema4, for competitive gain. Accordingly, Fletcher's conduct warrants an award of punitive damages pursuant to Conn. Gen. Stat. § 35-53.

54. As a result of Fletcher's misappropriation of Sema4's confidential and proprietary information Sema4 has been damaged. However, the damage to Sema4 occasioned by Fletcher's misappropriation of Sema4's confidential information is difficult or impossible to quantify, and hence is irreparable in nature.

## COUNT IV:
## VIOLATION OF THE CONNECTICUT
## UNFAIR TRADE PRACTICES ACT ("CUTPA")

55. Sema4 incorporates and realleges paragraphs 1 through 54 above as if fully set forth herein.

56. By engaging in the conduct set forth above, Fletcher has committed a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b(a), in that his conduct: offends public policy; is immoral, unethical, oppressive and/or unscrupulous; and/or has caused—and continues to cause—substantial injury to Sema4 that could not have reasonably been avoided by Sema4, and such conduct is not outweighed by any countervailing benefit.

57. Fletcher was fully aware of his obligations under the PIIA and the Non-Competition Agreement, but nevertheless failed to abide by the PIIA's non-disclosure and non-solicitation covenants and the Non-Competition Agreement's non-disclosure, non-solicitation, and non-competition clauses. Accordingly, Fletcher's conduct warrants an award of punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

58. Fletcher's continued violation of CUTPA causes Sema4 irreparable harm and warrants the issuance of a temporary restraining order and/or injunction preventing the further use

of unfair and deceptive trade practices as well as an award of monetary damages pursuant to CUTPA, including attorney's fees.

## COUNT V:
## BREACH OF THE DUTY OF LOYALTY

59. Sema4 incorporates and realleges paragraphs 1 through 58 above as if fully set forth herein.

60. As an employee of Sema4, Fletcher owed Sema4 a duty of loyalty. Fletcher violated this duty of loyalty when, while still actively employed and being compensated by Sema4, he acted for the benefit of his own financial interest and for the interests of a Sema4 competitor, and therefore contrary to Sema4's best interests by, *inter alia*:

(a) misappropriating Sema4's proprietary gene list to assist Natera, his current employer and Sema4's direct competitor;

(b) accepting employment with Natera, in violation of the Non-Competition Agreement's non-competition covenant;

(c) upon information and belief, disclosing Sema4's confidential trade secrets and proprietary information to Natera in violation of the non-disclosure covenants set forth in the PIIA and the Non-Competition Agreement; and

(d) upon information and belief, soliciting Sema4's employee and current and prospective customers, in violation of the non-solicitation covenants set forth in the PIIA and the Non-Competition Agreement.

61. As a faithless servant, Fletcher's breach of his duty of loyalty is properly remediated by a forfeiture of the compensation Sema4 paid to him during the period of disloyalty, in addition to an award of monetary damages.

**WHEREFORE**, Sema4 respectfully requests that this Court:

1. Enter a temporary restraining order and/or preliminary injunction that: (a) enjoins Fletcher from directly competing with Sema4 on behalf of Natera or any other competitor of Sema4 in violation of the Non-Competition Agreement; (b) enjoins Fletcher from disclosing any of Sema4's confidential trade secrets or proprietary information in violation of the PIIA, the Non-Competition Agreement, the DTSA, and/or the common law; and (c) enjoins Fletcher from soliciting Sema4's current or prospective customers in violation of the PIIA and the Non-Competition Agreement;

2. Award Sema4 damages attendant to the misappropriation of confidential information and trade secrets committed by Fletcher in an amount to be determined at trial;

3. Award Sema4 damages attendant to Fletcher's breach of contract in an amount to be determined at trial;

4. Award Sema4 damages attendant to Fletcher's breach of the duty of loyalty, including forfeiture of the compensation Sema4 paid to Fletcher during the period of his disloyalty, in an amount to be determined at trial;

5. Award Sema4 punitive damages pursuant to Conn. Gen. Stat. § 35-53;

6. Award Sema4 punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a);

7. Award Sema4 its attorneys' fees, costs and expenses; and

8. Grant such other and further relief in Sema4's favor as the Court deems just and proper.

Respectfully submitted,

MOUNT SINAI GENOMICS, INC. d/b/a SEMA4

By: */s/ Mary A. Gambardella*
    Mary A. Gambardella (ct05386)
    mgambardella@wiggin.com
    Lawrence Peikes (ct07913)
    lpeikes@wiggin.com
    WIGGIN AND DANA LLP
    Its Attorneys
    Two Stamford Plaza
    281 Tresser Boulevard
    Stamford, CT  06901
    (203) 363-7600

# VERIFICATION

_Michelle Zimmerman_, being duly sworn, deposes and says: (1) I am over the age of eighteen and understand the obligation of an oath; (2) I am [TITLE] _SVP and GM of Oncology Solutions_ of Mount Sinai Genomics, Inc. d/b/a Sema4 and am duly authorized to act on its behalf; (3) I have read the foregoing Verified Complaint and swear that the allegations stated therein are true and accurate based on my personal knowledge, and/or information provided to me by others which I believe to be true and accurate, and/or books and records maintained by me or others in the ordinary course of business; and (4) I am authorized to execute this Verification on behalf of plaintiff.

_[signature]_
MICHELLE ZIMMERMAN
Senior Vice President and General Manager of
Oncology Solutions
Mount Sinai Genomics, Inc. d/b/a Sema4
*Duly Authorized*

Subscribed and sworn to before me
this ___ day of April, 2020.

_[signature]_
Notary Public _Commissioner of the Superior Court_
My Commission expires: _____
26871\16\4839-6809-4647.v1